UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
ASEAN O. JONES,

                Plaintiff,

- AGAINST -

CITY OF NEW YORK, ERIC MACFARLANE,
JANICE STROUGHTER, LISA ROBBINS,
NAREESA NABIBAKSH, and JENNIFER LESTER,

                Defendants.
------------------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
14-CV-0826 (CBA) (RLM)

AMON, Chief United States District Judge.

Plaintiff Asean Jones brings this action asserting claims of discrimination on the basis of skin color and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.[1] ("Title VII"), and Sections 1981[2] and 1983[3] of Title 42. Defendants City of New York, Eric MacFarlane ("MacFarlane"), Janice Stroughter ("Stroughter"), Lisa Robbins ("Robbins"), Nareesa Nabibaksh ("Nabibaksh") and Jennifer Lester ("Lester") move to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons laid out below, defendants' motion is granted.

## BACKGROUND

Jones self-describes as an African American female of Caribbean/Guyanese descent with a dark brown complexion. (Compl. ¶ 4.) In March 2012, Jones was hired as an Administrative

---

[1] Title VII prohibits an employer from discriminating against any individual with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1).

[2] Section 1981 guarantees that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a).

[3] Section 1983 provides an express cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

Staff Analyst for the New York City Department of Design and Construction ("DDC"), subject to a one-year probationary period. (Id. ¶¶ 21, 23.) At the DDC, Jones reported to Paul Roppa ("Roppa"), the Director of "BID Process Management," and was responsible for processing and analyzing construction bids. (Id. ¶¶ 22, 45.)

In the beginning of April 2012, a few weeks after Jones began at the DDC, Gary Ambroise ("Ambroise"), a "Project Manager within [the] Infrastructure [Division]," asked Jones out to lunch. (Id. ¶ 79.) Ambroise is a black man of Haitian descent. (Id.) Following that initial date, Jones learned Ambroise was already dating another woman in the office, defendant Nabibaksh, and refused to continue seeing him. (Id. ¶ 80.)

Nevertheless, shortly after the lunch date, Nabibaksh and two of her friends, defendants Robbins and Lester (collectively, the "Co-Worker Defendants"),[4] became openly hostile towards Jones. (Id.) Jones alleges that the Co-Worker Defendants began a campaign of harassment against her, which consisted of "folding their arms . . . , rolling their eyes . . . , looking [her] up and down in disgust, glaring at [her]," gossiping about whether she wore a weave and questioning her job qualifications. (Id. ¶¶ 41, 43-44, 58-60, 80.)

By June 2012, Jones had moved her desk and chair to avoid interactions with the Co-Worker Defendants. (Id. ¶ 42.) She also approached her supervisor Roppa and explained the problems she was having with those three women. (Id. ¶ 47.) As a result, Roppa permitted Jones to change her printing location, began filing documents on her behalf and requested that management provide her with a higher cubicle wall to minimize further her contact with them. (Id. ¶¶ 47-49.)

---

[4] Defendants Robbins and Lester are African American women with medium brown complexions; Nabibaksh—like Jones—is a Guyanese woman, but is of Indian descent with a tan complexion. (Id. ¶¶ 14, 16, 18.) During the relevant time period, all three Co-Worker Defendants were employed as Community Liaisons for the DDC and reported to Maria Centaro. (Id. ¶¶ 13, 15, 17, 32.)

2

In late July 2012, Jones reported her incidents with the Co-Worker Defendants to numerous other officials at the DDC, including: Robert Silver, a public safety officer; defendant Stroughter, the Human Resources Director; Frances Artale, Chief of Staff for the Infrastructure Division; and defendant MacFarlane, the Infrastructure Division's Deputy Commissioner. (Id. ¶¶ 27-28, 31-33, 35-38, 40.) During her first meeting with Stroughter, Jones alleges that Stroughter blamed the "harassment" on Jones' age, stating "[d]on't take this as an insult, but you look like a baby compared to them." (Id. ¶ 28.) At a subsequent meeting, Jones alleges that Stroughter told her that Lester was "obsessed with extensions," referring to Jones' hair, and that the Co-Worker Defendants would be disciplined for "bullying." (Id. ¶¶ 37-38.) Stroughter also passed along her adult daughter's advice that Jones address any speculation about her hair by "tell[ing] the[] [Co-Worker Defendants] this is my weave and so what." (Id. ¶ 40.)

In August of 2012, New York City investigators were assigned to verify Jones' complaints. (Id. ¶ 50.) Although, Jones called them several times to report claims of harassment, ultimately the investigators did not witness any incidents first-hand. (Id. ¶¶ 51-52.)

Assigning investigators did not put an end to the incessant gossip about Jones' hair. Specifically, in August 2012, Jones heard the following statements from the Co-Worker Defendants: (1) "[I] know a weave when I see one and her hair is too long, that b*tch has a weave," (2) "[H]ow many brown skinned people have you seen with hair that length? That's a weave she's not mixed," and (3) "[I]f that isn't her hair then it must be a real expensive weave. She can't afford something like that on her salary." (Id. ¶¶ 53-54, 57.) In order to avoid hearing such statements, Jones began to listen to the radio at low volume while working. (Id. ¶ 62.)

Gossip about Jones' hair persisted. Jones raises two specific statements from the Co-Worker Defendants in January: (1) "[S]he wants you all to think that's her hair and I'm going to

3

expose her," and (2) "[D]id you see her today? Did you check out her outfit? She can't afford that. I bet you she takes part in some red light activity." (Id. ¶¶ 55-56.)

The conflict between Jones and Nabibaksh came to a head on January 24, 2013, when the two women had a physical altercation in the DDC's third-floor hallway. (Id. ¶¶ 63-66.) Jones alleges that Nabibaksh deliberately, and without provocation, struck her in the shoulder while she was walking to the bathroom. (Id.)

A week later, while Jones' direct supervisor was out of the office, MacFarlane and Stroughter requested that she meet with them in the DDC's law library. (Id. ¶¶ 68, 76.) Stroughter presented Jones with a form resignation letter and informed her that she needed to resign or else she would be fired. (Id. ¶ 69.) In response to Jones' questions, MacFarlane told her that "management wasn't happy with her and that she had two [] minutes to make a decision" about whether to resign. (Id. ¶¶ 70-71.) Jones ultimately signed the resignation letter because being terminated would have hindered her ability to find another job. (Id. ¶ 73.) She was not permitted to consult with an attorney or union representative. (Id. ¶ 74.) After signing the letter, Jones saw MacFarlane and Stroughter mouth the word "sorry." (Id. ¶ 75.) Following Jones' resignation, she learned that the Co-Worker Defendants continued to gossip about her and that Nabibaksh bragged that she "got that b*tch fired." (Id. ¶¶ 92-93.)

The Complaint alleges that the Co-Worker Defendants visited similar treatment on several other women at the DDC. In particular, it supplies accounts from two women who claim to have also incurred the wrath of the Co-Worker Defendants: (1) MacFarlane's executive assistant, a fair-skinned Hispanic woman named Francia, and (2) Jones' mentor, Marie Jean Louise, a Haitian woman with a dark complexion. (Id. ¶¶ 87-90.) In addition, Sunita Baksh, an employee in Human Resources, stated that the Co-Worker Defendants had "harassed and abused

4

... a[] lot of other women within the company." (Id. ¶ 86.) In order to prevent such incidents in the future, DDC management separated the Co-Worker Defendants. (Id. ¶¶ 94-95.)

Jones filed a Charge of Discrimination with the Equal Employment Opportunity Commission on February 28, 2013, claiming that the defendants discriminated against her on the basis of her darker skin color and her national origin.[5] On November 26, 2013, the EEOC concluded its investigation, without filing charges, and advised Jones of her right to sue under Title VII. Jones then timely commenced this suit on February 6, 2014. The gravamen of Jones' Complaint is that her termination resulted from impermissible discrimination based on her darker skin color and non-Haitian origin.

## DISCUSSION

### I. Standard of Review

To avoid dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Plausibility requires "the plaintiff [to] plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Although "detailed factual allegations" are not required, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do." Id. (quoting Twombly, 550 U.S. at 555). Similarly, a complaint is insufficient to state a claim "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 557).

---

[5] Jones identifies as an African American woman of Guyanese descent and it is therefore not immediately clear whether she claims Guyana or the United States as her country of origin. However, since Jones claims that all non-Haitians were subject to discrimination at the DDC, the Court need not assign her a particular national origin to consider the sufficiency of her allegations.

5

## II. The Discrimination Claims

Jones alleges two forms of discrimination: color discrimination and national origin discrimination. The bulk of the Complaint focuses on the harassment she faced from the Co-Worker Defendants, including frequent speculation about her hair. Jones claims that harassment resulted, at least in part, from the fact that she had a darker complexion than those three women. She further alleges that MacFarlane, a Haitian man, generally favored other Haitians, including Ambroise. Since Ambroise dated Nabibaksh, Jones reasons that MacFarlane's decision to terminate her must be based on favoritism for a fellow Haitian. She further alleges that her otherwise positive employment reviews support an inference that her termination was based on illegal bias, rather than objective performance.

Although defendants raise a number of arguments questioning the viability of Jones' various claims, the Court will proceed to the dispositive issue: whether the factual allegations are sufficient to support her discrimination claims. As such, the Court need not consider the defendants' additional arguments that (1) Jones' claims are not cognizable under Section 1981, (2) that, even if they were, Section 1983 provides the sole avenue of relief or (3) their dubious contention that a forced resignation does not constitute an adverse employment event.

Jones raises her discrimination claims under three separate federal statutes: Title VII, Section 1981 and Section 1983. However, since the "same framework and pleading standard" govern all three statutes, Awad v. City of New York, No. 13-cv-5753 (BMC), 2014 WL 1814114, at *5 (E.D.N.Y. May 7, 2014), the Court considers the claims together in determining the sufficiency of Jones' factual allegations.

### A. Pleading Standard for Discrimination Claims

Although "an employment discrimination plaintiff need not plead a prima facie case of discrimination," Swierkiewicz v. Sorema N.A., 534 U.S. 506, 515 (2002), "dismissal is

nevertheless appropriate where the plaintiff 'failed to allege even the basic elements of a discriminatory action claim.'" Maldonado v. George Weston Bakeries, 441 F. App'x 808, 809 (2d Cir. 2011) (quoting Patane v. Clark, 508 F.3d 106, 112 n.3 (2d Cir. 2007) (per curiam)). "The sine qua non of a . . . discriminatory action claim . . . is that 'the discrimination must be because of [the protected characteristic].'" Patane, 508 F.3d at 112 (emphasis in original) (quoting Leibovitz v. N.Y.C. Transit Auth., 252 F.3d 179, 189 (2d Cir. 2001)).

Therefore, to avoid dismissal, a plaintiff must allege facts supporting "a facially plausible inference that the [d]efendants' actions were motivated by [discriminatory] animus." De La Peña v. Metro. Life Ins. Co., 953 F. Supp. 2d 393, 414 (E.D.N.Y. 2013), aff'd, 552 F. App'x 98 (2d Cir. 2014); Idlisan v. N. Shore-Long Island Jewish Health Sys., Inc., No. 13-cv-2345 (SJF) (GRB), 2014 WL 2157540, at *6-7 (E.D.N.Y. May 23, 2014) (dismissing discrimination claims because "the complaint fails to plead any facts linking defendant's [actions] to [plaintiff's] race [or] national origin"). "Naked assertions of [] discrimination . . . without any specific allegation of a causal link between the [d]efendants' conduct and the [p]laintiff's [membership in a protected class], [are] too conclusory to withstand a motion to dismiss." Gaddy v. Waterfront Comm'n, No. 13-cv-3322 (AT) (HBP), 2014 WL 4739890, at *5 (S.D.N.Y. Sept. 19, 2014) (internal quotation marks and citations omitted); see Jackson v. Cnty. of Rockland, 450 F. App'x 15, 19 (2d Cir. 2011) ("[B]ald assertions of discrimination . . . unsupported by any comments, actions, or examples . . . from which we could infer that the defendants possessed a discriminatory . . . motive are . . . insufficient to survive a motion to dismiss.")

## B. Darker Skin Color

In support of her color discrimination claim, Jones relies on allegations of (1) gossip and gestures towards her made by the Co-Worker Defendants, (2) comments by defendant Stroughter and (3) the circumstances of her resignation, including the alleged apology from defendants

7

Stroughter and MacFarlane. (See Compl. ¶¶ 34, 39-44, 53-60, 63-67, 75-76, 79-80, 83.) Defendants respond persuasively that Jones' reliance on the Co-Worker Defendants' actions and statements is misplaced because they had no supervisory authority over her and were not involved in her resignation. Moreover, defendants argue that Jones has failed either to link her darker skin color to either the comments in question or her eventual termination.

Comments can support the necessary inference of discriminatory intent if the plaintiff "can establish a nexus between the alleged discriminatory remarks and the defendant's decision to terminate the plaintiff's employment." Del Franco v. N.Y.C. OffTrack Betting Corp., 429 F. Supp. 2d 529, 536 (E.D.N.Y. 2006). Because non-decisionmakers, by definition, play no part in the decision to terminate employment, their biases generally "provide no basis for imputing to [the decisionmaker] an invidious motivation for the discharge." Ganzy v. Sun Chem. Corp., No. 06-cv-3424 (FB) (MDG), 2008 WL 3286262, at *9 (E.D.N.Y. Aug. 8, 2008) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 137 (2d Cir. 1997)); see also Pathania v. Metro. Museum of Art, No. 11-cv-2119 (JMA), 2013 WL 1182076, at *14 (E.D.N.Y. Mar. 21, 2013).[6]

### a) Comments and Gestures Made by the Co-Worker Defendants

It is undisputed that the Co-Worker Defendants were non-decisionmakers that played no formal role in the decision to seek Jones' resignation. Indeed, Jones concedes that they "worked in a different [u]nit and reported to a different supervisor." (Opp. Br. at 1.) As such, the statements and actions attributed to the Co-Worker Defendants fail to support a plausible claim

---

[6] Of course, "an employer cannot shield itself from liability . . . by using a purportedly independent person . . . as the decisionmaker where th[at] decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design." Siani v. State Univ. of N.Y. at Farmingdale, 7 F. Supp. 3d 304, 327 (E.D.N.Y. 2014) (citation omitted); see also Rose v. N.Y.C. Bd. of Educ., 257 F.3d 156, 162 (2d Cir. 2001) (comments by supervisor with "enormous influence in the decision-making process" provided direct evidence of discrimination despite supervisor's lack of formal firing power). Jones, however, does not advance such a "cat's paw" scenario, and even if she did, it would fail because she "alleges no facts to suggest that the decisionmakers in [her] eventual termination . . . took their cues from or simply rubberstamped the actions of . . . anyone else who may have possessed a discriminatory motive." Gomez v. City of New York, 12-cv-6409 (RJS), 2014 WL 4058700, at *5 (S.D.N.Y. Aug. 14, 2014).

8

of discrimination. See, e.g., Ganzy, 2008 WL 3286262, at *9-10; see also Mantione v. Ted Bates Adver./N.Y., 84-cv-2000 (LBS), 1985 WL 2516, at *7 (S.D.N.Y. Sept. 10, 1985) (finding comments irrelevant because the speaker "was not in a position of authority regarding employment decisions").

Jones attempts to draw a connection between her termination and the Co-Worker Defendants' gossip by noting that MacFarlane, one of the decisionmakers, was friends with Ambroise, who in turn dated Nabibaksh. (See Oral Arg. Tr. 9:15-10:24.) That contention is both far too tenuous and legally insufficient. Although good taste may dictate otherwise, neither Title VII nor Section 1983 prevent a supervisor from favoring his romantic partner over other employees. Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C., No. 11-cv-5035 (ADS) (AKT), 2012 WL 3241402, at *7-8 (E.D.N.Y. Aug. 3, 2012) ("[I]t is well-settled that favoritism of an employee based on a consensual romantic relationship, frequently referred to as 'the paramour preference,' is not actionable under Title VII.") (citing DeCinto v. Westchester Cnty. Med. Ctr., 807 F.2d 304, 308 (2d Cir. 1986)), aff'd, 716 F.3d 10 (2d Cir. 2013). Nor do those laws "prohibit people from favoring their friends, however unjust or unfair that may be." Hooda v. Brookhaven Nat. Lab., 659 F. Supp. 2d 382, 391 (E.D.N.Y. 2009). Simply put, "an employer can fire an employee for any reason as long as the reason is non-discriminatory even if based on reasons that are unbecoming or small-minded, such as back-scratching, log-rolling, horse-trading, institutional politics, envy, nepotism, spite, or personal hostility." Kouakou v. Fideliscare N.Y., 920 F. Supp. 2d 391, 399 (S.D.N.Y. 2012) (quotation marks and citation omitted). Since even a claim that MacFarlane acted in favor of his own girlfriend would fail, Jones' claim that he was motivated by a desire to help assuage Ambroise's jilted lover clearly falls short.

Moreover, even if the Co-Worker Defendants' gossip and gestures were considered, the Complaint fails to plead any facts sufficient to link their inane speculation about Jones' hair to impermissible color discrimination.[7] See Idlisan, 2014 WL 2157540, at *6-7. Although Jones may well have subjectively believed that defendants' comments about her weave were tied to her skin color, (see Compl. ¶ 39), that is plainly insufficient. Mohawk v. William Floyd Sch. Dist., 13-cv-2518 (JS) (GRB), 2014 WL 838162, at *3 (E.D.N.Y. Mar. 3, 2014) (dismissing claim where plaintiff "fail[ed] to allege any facts, besides his own subjective belief, that plausibly suggest that the altercations . . . were in any way connected to his . . . color[] or national origin"); Brodt v. City of New York, 4 F. Supp. 3d 562, 568 (S.D.N.Y. 2014) ("[A] plaintiff's feelings and perceptions of being discriminated against are not evidence of discrimination.") (internal quotation marks and citation omitted); see also Munoz-Nagel v. Guess, Inc., No. 12-cv-1312 (ER), 2013 WL 1809772, at *3, 7 (S.D.N.Y. Apr. 30, 2013) (pleadings based on information and belief are nothing more than speculative claims or conclusory assertions when unaccompanied by supporting facts).

Jones' reliance on Bryant v. Begin Manage Program, 281 F. Supp. 2d 561 (E.D.N.Y. 2003), is misplaced because the facts in that case are materially distinguishable from those alleged here. In Bryant, the plaintiff, an African American woman with dyed blond hair, claimed that her African American supervisor discriminated against her by repeatedly calling her a "wannabe" and instructing her to wear more African clothing. Id. at 565-66. Although

---

[7] To the contrary, Jones asks the Court to take judicial notice of that fact that "hair extensions a/k/a hair weaves are worn by many black women, but not all, and white women, but not all, also wear hair weaves/extensions." (Opp. Br. at 5 n.4.) That invitation effectively concedes that weaves are not so extrinsically tied to a racial group that gossip regarding one constitutes impermissible discrimination. Cf. Constance v. Pepsi Cola Bottling Co. of N.Y., Inc., No. 03-CV-5009 (CBA) (MDG), 2007 WL 2460688, at *22 (E.D.N.Y. Aug. 24, 2007) (finding plaintiff failed to establish a connection between a policy prohibiting dreadlocks and his national origin because he "provides no information that the dreadlocked hairstyle is an identifiable characteristic of Trinidadians other than the fact that he is a Trinidadian with dreadlocks"); Eatman v. United Parcel Serv., 194 F. Supp. 2d 256, 264 (S.D.N.Y. 2002) ("[C]ircumstantial evidence that most of the employees affected by a policy [prohibiting dreadlocks] are black would not, on its own, reasonably support a finding of discriminatory intent against African-Americans.").

10

threadbare, those allegations can at least arguably give rise to the inference that the plaintiff's supervisor viewed her negatively because she failed to conform to racial stereotypes. Cf. Price Waterhouse v. Hopkins, 490 U.S. 228, 250-51 (1989) (actions based on gender-based stereotypes implicate Title VII). By contrast, the statements Jones relies on were made by her co-workers and lack any objective tie to either her skin color or eventual termination.[8] Her failure to provide such factual support is fatal to her claims.[9]

### b) Comments Made by Defendant Stroughter

Next, Jones claims that two comments by defendant Stroughter prior to the meeting where Jones resigned raise an inference of discriminatory intent. (See Compl. ¶ 37 (telling Jones that defendant Lester was "obsessed with extensions"), ¶ 40 (conveying Stroughter's adult daughter's view that "that if she were [Jones], she would tell them this is my weave and so what").)[10] Neither statement, however, provides the missing link between Jones' resignation and her skin color necessary to save her claim from dismissal. See De La Peña, 953 F. Supp. 2d at 414; Gaddy, 2014 WL 4739890, at *5; Idlisan, 2014 WL 2157540, at *6-7; DelFranco, 429 F. Supp. 2d. at 536.

---

[8] It is true that in one statement, defendant Lester invokes race by stating: "[H]ow many brown skinned people have you seen with hair that length? That's a weave she's not mixed." (Compl. ¶ 54.) That single stray comment, however, is far too slender a reed to support a charge of color discrimination. Not only was it uttered nearly five months prior to Jones' resignation, but it also fails to make any mention of her darker skin color. Moreover, that statement reflects merely the defendants' continued speculation about whether Jones wears a weave. Jones' claim that it instead reflects discriminatory animus based on her lack of Afrocentricity simply does not follow from the natural reading of those words.

[9] To the extent Jones argues that Bryant stands for the proposition that any comment about an employee's hairstyle draws an inference of discriminatory intent, she misreads the case. Indeed, Judge Trager specifically distinguished another case where allegations that a supervisor called plaintiff's hair "nappy" failed to raise such an inference. Bryant, 281 F. Supp.2d at 570 n.8 (distinguishing Sanders v. Mt. Sinai Med. Ctr., No. 98-cv-828 (AGS), 1999 WL 1029734, at *6-7 (S.D.N.Y. Nov. 10, 1999)).

[10] At oral argument, Jones conceded there was nothing improper about the statement: "[d]on't take this as an insult, but you look like a baby compared to them." (See Oral Arg. Tr. 14:9-11.)

### c) The Circumstances Surrounding Jones' Resignation

Finally, Jones claims that the circumstances of her resignation can support an inference of discriminatory intent. Specifically, she argues that by failing to include her direct supervisor in the resignation meeting and mouthing the word "sorry" after demanding her resignation, MacFarlane and Stroughter implicitly acknowledged the presence of illegal discrimination. (Compl. ¶¶ 75-76.)

In support of that argument, Jones offers nothing but her subjective belief to link those circumstances to her skin color. But as the Court has made clear: Jones' own unsupported speculation cannot bridge the chasm between those race-neutral actions and discriminatory animus. See Mohawk, 2014 WL 838162, at *3; Brodt, 4 F. Supp. 3d at 568; see also Deniran v. Mattingly, No. 07-cv-6159 (RJS), 2009 WL 857621, at *5 (S.D.N.Y. Mar. 31, 2009) (dismissing complaint for failing to plead "a single instance of objective conduct by any [d]efendant that was related to [p]laintiffs' race"), aff'd, 377 F. App'x 117 (2d Cir. 2010); Reyes v. Erickson, 238 F. Supp. 2d 632, 639 (S.D.N.Y. 2003) (similar). As the circumstances Jones points to are objectively race-neutral, they fail to support her claims.

### C.  Non-Haitian Origin

In support of her national origin claim, Jones alleges that: (1) a co-worker stated that defendant MacFarlane favors Haitians over other employees, (2) there is a group of Haitians that socialize together, and (3) MacFarlane forced her to resign in support of a fellow Haitian. (Compl. ¶¶ 77-78, 83.) The Court considers each allegation in turn.

First, Jones' reliance on Jamie Whitehead's unsubstantiated statement that "if your [sic] not Haitian[,] your [sic] not getting anywhere in this company," (id. ¶ 77), fails to support her claim. Even assuming Whitehead truly made that statement, his conclusory comments are

entitled to no more weight than Jones' own unsupported speculation. See Mohawk, 2014 WL 838162, at *3; Brodt, 4 F. Supp. 3d at 568; see also Munoz-Nagel, 2013 WL 1809772, at *3, 7.

Second, the mere fact that the DDC employs several Haitians is plainly insufficient to support an inference of discriminatory animus. See Turner v. N.Y. Univ. Hosps. Ctr., 784 F. Supp. 2d 266, 283 (S.D.N.Y. 2011) ("[D]ifferences in national origin and race are simply insufficient to themselves demonstrate intentional unlawful discrimination."); Johnson v. City of New York, 669 F. Supp. 2d 444, 450 (S.D.N.Y. 2009) (similar). The claim that such employees socialize together is likewise irrelevant. Cf. Hooda, 659 F. Supp. 2d at 391 (holding that supervisors can favor friends without running afoul of the federal discrimination laws).

Third, as previously explained, Jones' claim that MacFarlane forced her to resign out of "support[] and sympath[y] [for] Nabibaksh because she had a personal involvement with [] Ambroise," (Compl. ¶ 83), simply fails to allege an illegal act. See, e.g., Kelly, 716 F.3d at 14 (affirming dismissal of claim alleging discrimination based on favoritism shown to employer's romantic partner).

In sum, Jones' national origin claim amounts to little more than a flawed syllogism that because she is not Haitian and something unfortunate happened to her, the two must be linked. That falls well short of the pleading bar. Rivera v. Metro. Transit Auth., 750 F. Supp. 2d 456, 461–62 (S.D.N.Y. 2010) ("While racism and all its manifestations are deplorable, the inference that it is present whenever something unwelcome happens to a member of an identifiable minority group is not rational."). The Court therefore grants defendants' motion to dismiss the national origin claim.

### D. Hostile Work Environment

Jones alleges that she was subject to "harassment consisting of daily insults" levied at her by the Co-Worker Defendants and unwanted gossip about her hair and job qualifications.

(Compl. ¶¶ 26, 34, 37, 39-43, 53-60, 63-67, 80, 83.) Defendants correctly counter that even assuming Jones' allegations are true, she has failed to link any harassment to her membership in a protected class.

"[I]t is axiomatic that mistreatment at work, through subjection to a hostile environment . . . is actionable under Title VII only when it occurs because of an employee's . . . protected characteristic." Rivera v. Rochester Genesee Regional Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2012) (quoting Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001)). "Bullying and harassment have no place in the workplace, but unless they are motivated by the victim's membership in a protected class, they do not provide the basis for an action under [the federal discrimination laws]." Johnson v. City Univ. of N.Y., No. 14-cv-587 (VEC), 2014 WL 4412475, at *1 (S.D.N.Y. Sept. 8, 2014).

To survive dismissal, the purported acts of harassment "must occur under circumstance[s] in which the[y] . . . can reasonably be interpreted as having taken place on the basis of [a protected] trait or condition." Fordham v. Islip Union Free Sch. Dist., 662 F. Supp. 2d 261, 273 (E.D.N.Y. 2009). Simply put, if the environment is equally harsh for employees regardless of race or national origin, a hostile work environment claim must fail. See id. at 272-73 (quoting Brennan v. Metro. Opera Ass'n, Inc., 192 F.3d 310, 318 (2d Cir. 1999)).

Here, Jones' claims fall short because she pleads no facts tying the Co-Worker Defendants' personal animosity against her to a protected characteristic. See Idlisan, 2014 WL 2157540, at *6-7. Nor can Jones' own subjective beliefs establish the necessary link. Mohawk, 2014 WL 838162, at *3; Brodt, 4 F. Supp. 3d at 568; see also Munoz-Nagel, 2013 WL 1809772, at *3, 7.

Moreover, the pattern of harassment that Jones identifies in the Complaint only further confirms that the purported harassment lacked any connection to her darker skin color or non-Haitian origin. Notably, Jones asserts that Marie Jean Louise—her Haitian mentor—and MacFarlane's executive assistant—a fair-skinned Latina—each suffered similar treatment at the hands of the Co-Worker Defendants. (Compl. ¶¶ 87-90.) Since Jones' own allegations make clear that the Co-Worker Defendants bullied light skinned employees, as well as dark, and targeted Haitians alongside non-Haitians, the federal discrimination laws provide her no relief. See Fordham, 662 F. Supp. 2d at 272-73; see also Johnson, 2014 WL 4412475, at *1 ("Victims of non-discriminatory bullying at the workplace, like those treated unfairly for reasons other than their membership in a protected class, must look outside [the federal discrimination laws] to secure what may be their fair due.").

### E. Race-Neutral Motives for Termination

Finally, a plaintiff fails to clear the pleading bar if her complaint does not contain "specific facts supporting a claim of racial animus," but does provide "other possible [race-neutral] motives" for the adverse action. Robledo v. Bond No. 9, 965 F. Supp. 2d 470, 475 (S.D.N.Y. 2013); see Yusuf v. Vassar Coll., 35 F.3d 709, 714 (2d Cir. 1994) (dismissing complaint because it failed to provide factual support for "naked allegation" of discrimination, but did allege several non-discriminatory reasons why members of college discipline panel were likely biased against the plaintiff).

Jones' own Complaint does just that. Far from establishing the necessary connection to a protected characteristic, it specifically pleads a non-discriminatory basis for the alleged conduct: the jealousy of a spurned lover. Jones concedes that her lunch date with Ambroise—not her darker skin color or non-Haitian origin—made her "a target of Nabibaksh, Robbins and Lester." (Opp. Br. at 16 (citing Compl. ¶¶ 79-80); see also Oral Arg. Tr. 7:20-25.) Since an apparently

unfaithful boyfriend—not illegal discrimination—launched the Co-Worker Defendants' campaign against Jones, dismissal is appropriate. See Green v. Dist. Council 1707, No. 13-cv-8671 (PAE), 2014 WL 3734101, at *9 (S.D.N.Y. July 29, 2014) (dismissing case lacking specific factual support for racial animus in firing and noting that plaintiff "was fired shortly after he got in a fight with, and made arguably insubordinate comments to . . . his supervisor"). The Court will not countenance Jones' attempt to transform her love triangle into a federal discrimination suit.

### F. Monell Claims

Jones' failure to plead adequately a constitutional violation by an individual defendant renders her Monell claims moot. Escobar v. City of New York, 766 F. Supp. 2d 415, 418 (E.D.N.Y. 2011) (citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986)). The Court therefore dismisses those claims.

## III. State Law Slander Claim

As the Court has dismissed all federal causes of action, it declines to exercise supplemental jurisdiction over Jones' state-law slander claim. 28 U.S.C. § 1367(c)(3); see Duncan v. City of New York, 11-cv-3826 (CBA) (JO), 2012 WL 1672929, at *3 (E.D.N.Y. May 14, 2012) (citing Carnegie–Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)).

## IV. Leave to Amend

In cases, like this one, where the plaintiff does not seek leave to amend, it is within the Court's discretion not to provide it and instead to dismiss the complaint with prejudice. See Shields v. City Bancorp, Inc., 25 F.3d 1124, 1132 (2d Cir. 1994).

That is particularly appropriate here because Jones concedes she can provide no facts to render her claims plausible (Oral Arg. Tr. 26:7-20) and therefore any potential amendment would be futile. See Cruz v. Garden of Eden Wholesale, Inc., No. 12-cv-5188 (BMC) (MDG),

2012 WL 5386046, at *2 (E.D.N.Y. Oct. 26, 2012) ("In light of [plaintiff's] . . . acknowledge[ment] that she has no facts supporting her claim of illegal discrimination, granting leave to amend would be futile.") Thus, leave is denied and the Complaint is dismissed with prejudice.

## CONCLUSION

For the reasons stated above, defendants' motion is granted and the Complaint is dismissed in its entirety. The Clerk of Court is directed to enter Judgment in favor of defendants and close the case.

SO ORDERED.

Dated: February 4, 2015
Brooklyn, New York

s/Carol Bagley Amon

Carol Bagley Amon
Chief United States District Judge